Axwell. Yes, ma'am. Your honor. We have to happily counselors on this case. Scott M. Day is going to argue first for 10 minutes and part passman is going to argue second for five minutes. If you're ready, I'll call the case. I am here. You hear you. This honorable appellate court for the Second Judicial District is now open. The Honorable Anne B. Jorgensen presiding. Your second case on the docket 2-20-0342 Shoub Properties, LLC et al. Plaintiff's appellants, the Village of Glen Ellyn et al. Defendants Appellees. Arguing for the appellant, Mark W. Daniel. Arguing for the Appellee Village of Glen Ellyn, Scott M. Day. Arguing for the Appellee's 400 Main and G. S. P. Development part M. Passman. All right, then. Is everyone ready to proceed? Yes, we are. You may begin when you're ready. Then may please the court. Good morning. My name is Mark Daniel. I represent Shoub Properties, Jonathan and Anne Brasier, and citizens for Glen Ellyn Preservation. In this matter, we are appealing the circuit court's judgment on several grounds, the most important of which I believe is the summary judgment determination. The most important of which I believe is the summary judgment determination concerning counts seven and eight, which are related to counts nine and 10 of the amended complaint that is an issue. Counts seven and eight pertain to a LaSalle- Sinclair pipeline due process challenge to a zoning determination made by the Village of Glen Ellyn, which is a Home Rule community. And in this instance, the zoning determination was to be reviewed for a rational basis to determine whether or not it was arbitrary and capricious, violated the various factors set forth for decades under Illinois law. You know, counsel, you argue that the diminution in the value of the Shoub parcel and the other deviations from the planning documents create a question of fact to preclude the summary judgment, correct? But weren't all of the necessary public hearings held where Shoub and other interested parties had the ability to address these concerns? No, they were not all held. There were public hearings held, but not all the required hearings were held. In the complaint, counts five and six address omitted special use permits for a public parking garage and a private parking garage. However, with respect to what was approved, there were hearings that were held and braziers did not receive notice, but they participated in any event and their parties to this suit. The LaSalle factors were raised through affidavits and facts presented in those affidavits that tied to each of the elements to be considered under the LaSalle Sinclair standards. So those were at issue. Judge Wheaton determined to decide the case only upon the amount of time spent the various studies, the various planning documents, not just the comprehensive plan. We're talking about downtown landscape studies, downtown streetscape studies, you know, different documents that were not carried through the entire process for zoning and didn't really have the effect of law. The comprehensive plan itself doesn't have the effect of law, but it is a pretty weighty document under the LaSalle Sinclair standards. In this instance, that was really the only factor that Judge Wheaton considered and the defendant's position, the village and the developer in this case, their position was essentially judge. We spend all this time and even though the policies that we're presenting you are contested, look at the time we spent. That is not a rational basis argument. That is a judge. We made an effort. Please reward us argument. And in this instance, the defendants and appellees are essentially asking the appellate court to ignore the LaSalle Sinclair standards that have developed under rational basis analyses for substantive due process for decades and decades. In the most recent cases, you can see in Paul versus Ogle County, you can see in our savior Lutheran Church versus city of Aurora, you know, the second district has been in lockstep with other districts in Illinois and there is no reason whatsoever to abandon the LaSalle Sinclair pipeline analysis and in particular on summary judgment to say that with affidavits pending and nothing countering them other than planning documents, some of which aren't even the comprehensive plan. Compelling judgment in favor of the defendants is clearly a reversible error in this case. Um, you had touched on the other parking spots. Um, isn't their revenue from tiff to pay those other parking spots that doesn't satisfy? Um, what you are submitting here. So in this instance, um, what agreement and under the sales agreement was required to build and reconvey to the village, a public parking garage, a private parking garage for the residential component of the development was also to be constructed with respect to the public parking garage. There was a net reduction in parking within the block face that we're dealing with in Glen Ellen during the course of the litigation, the village of Glen Ellen. And I don't believe this is very clearly set forth in the record. It came out during some of the summary judgment arguments, but there was a public parking deck approved on the other side of downtown Glen Ellen that was going to be constructed and is being constructed with village funds. The reality was that our parking consultant who filed an affidavit in this case, in opposition to summary judgment, testified that the parking was miscalculated, that the parking necessary for the commercial uses on the first floor of this development was miscalculated and that overall there was a net loss to the district as a result of this development. Now, due to the parking deck on the other side of downtown being constructed, none of that really made it into the summary judgment analysis, except in passing argument that there was a benefit to the village because funds from this development might be able to support that public parking deck. So that bit of it is incomplete. It was a late developing factor in the litigation. All right, so the LaSalle-Sinclair factors are important. I have not identified any case in Illinois where an appellate court did not follow the LaSalle-Sinclair pipeline analysis. The only instance where summary judgment was granted on the basis of plans and documents was an instance where none of the factors were challenged, that none of them were disputed. That's the only of other issues. I believe that it's rather critical to focus on the omitted special uses. All right, Glen Ellyn's a home rule community and there's, you know, let me point out one other thing on the LaSalle-Sinclair factors. We have never argued, despite the appellee's position, that those are exclusive factors. We have never argued that appellees could not present their just asked about on the TIF benefit. We never argued that. Our position has been that if you consider that issue, you should consider the breadth of the LaSalle-Sinclair factors because just because a TIF area has been designated and just because this project was approved doesn't mean the development carries the day. There are other factors to consider and they are not exclusive. We admit that, but they should be considered. All right, so count five and count six of the complaint address omitted special use approvals. Glen Ellyn is a home rule community. We all know from other cases that have developed at the Second District in the Illinois Supreme Court that in a home rule community, it's really a no harm no foul situation if the community doesn't follow its own internal processes or necessarily follow the zoning regulations that are part of its inherent authority. They get that authority under the Illinois Constitution, not the Zoning Enabling Act. Our position with respect to the omitted special uses is that the public parking garage and the private parking garage should have been the subject of special use review for each of those components of the development. Glen no special use approval is to be implied. No special use. The public parking garage, the private parking garage shall be deemed accessory to another use within a development. You have to get the approvals is what the code says. Now, I just told you that if they don't follow their own zoning, their home rule, it's usually no blood, no foul. But the exception to that comes into play when there's a constitutional right at issue. But doesn't the village code provide for a private cause of action for accessibility code violations under the zoning ordinance? Yes, this is a this question relates to counts three and four, right? Encounters three and four. We we challenge each of the public and private parking garages on the basis that they don't comply with the Illinois Accessibility Code. And yes, Glen Ellen does authorize a private right of action in addition to what's available under 11 1315 of the Illinois Municipal Code. So when it comes to the the omitted special uses, we have argued that they cannot proceed with this development because they never got the special use approval. Substantively, their approvals are incomplete, and those special uses were never made the subject of notice a public zoning hearing presentation of evidence, examination of that evidence and review according to the special use standards by the village. Within the overall development, there's no denying that they do show parking spaces inside this development. There's no denying that those parking spaces we have alleged are illegal. They regulations are not satisfied by these plans, and we have asserted that the Illinois Accessibility Code in the Environmental Barriers Act are statutes and regulations that support a private right of action. Mr. Daniel, I interrupt as it relates to this accessibility code going to the standing question for citizen is is the accessibility code part of the interests that the citizens group believes is germane to protect? Is that really what citizens is for or about? Well, you could. You could look at it. Justice Brennan is a circumstance where they might be viewed as overreaching, but you have to imagine downtown Glen up a circumstance where you have a downtown a South downtown Glen Ellyn historic district that is on the National Register of Historic Places. It's a district. There are historic resources within that district, and that's the parking area. I might concede. I would. I would argue that there's a good. I would say there's a good argument that citizens would have standing in various aspects of the litigation. I'm just asking specifically as it relates to counts three and four. I mean, accessibility. It seems a little far. I think instinctually you you are on point. It could be looked as though as if citizens is overreaching. Now, in this instance, if you have a historic district that is served by the public parking garage, that's where people park for the district. The South Main parking lot was eliminated by the project. That's where people parked previously. That South Main parking lot abuts the downtown historic district on two sides. So if you have accessibility problems within the code, the citizens organization has members that are impacted because they can't access or access with their families. Accessible parking space is the way they should be able to. Is that in the record that there are members of citizens that have disability issues? No, the use of the parking lot by members of citizens is in the record, right? The specific the particularity of the parking lot and the specificity that we got to in the pleadings because Judge Wheaton converted standing to more of a pleading requirement. In this case, we had a placard. And when he visits downtown Glen Ellen for meetings in restaurants regarding shop properties, principal tenant, he needs accessible parking. That's the detail to which we presented our standing. But we will be stuck on the general standing issue tied to the use of that South Main parking lot by members of citizens for Glen Allen now that Justice Brennan mentioned standing, I might conclude on the standing side with the discussion of Jonathan and Ann. Jonathan and Ann have nothing but right of way between their home and the development. Notice is required to go out to people within 250 ft of the development, excluding rights of way. They're in the notice territory. They did not receive notice. Indeed, they participated in the hearing process or the meeting process because a trustee reached out to them and said, You ought to be interested in this. So they got involved. The only way out of their neighborhood is westbound down Hillside Avenue to the intersection where they allege that traffic congestion will occur. There is no other vehicular way out of their seven. Their kids walk to school past the two north driveways of the development, which offer competing left turns across their kids school route. That's Jonathan and and standing. That is standing plain and simple. The argument that they face the same injury that others in Glen Allen that could be four or five miles away is simply incorrect. Others in Glen Allen don't have that loan vehicular access from their driveway out of their neighborhood. That's not a general harm that is specific. So in this case, I believe that you have ample opportunity to avoid the question of whether special injuries required. I think you can find special injury, which is what happened in Paul. And in Paul, the folks were 1000 or more. They were 1500 or more feet away. That was the Ogle County case. When it comes to standing for citizens on the other accounts, I think we've addressed organizational standing. Um, let's talk about how about these any standing or even if there is an issue with respect to the was at the shoe store that guy's shoe store that's been demolished, correct? That has been demolished. The I'm sorry. I don't want to interrupt you. Is that issue moot? That issue is not moot because the funding is still operative. So the development agreement remains operative. The village still has years of contributing funds towards the cost of the development that are reimbursable. So the fact that they didn't find that there was no prudent and reasonable alternative in our position is still a live issue because it never went before the Historic Preservation Commission for review. Council. Your time is drawing to a close. Justice Chastik, do you have any other questions? Um, if I can have just one second. Sure. Um, yeah, didn't the P. S. A. And the R. D. A. Allow for a range of performances. So if the current P. U. D. Is invalidated, shouldn't the developer have the opportunity to develop an alternate P. U. D. Which still complies with the P. S. A. And the R. D. A. With respect to the purchase and sale agreement, the P. S. A. That argument may be more accurate. There's a separate count addressing the development agreement, and our position with regard to that development agreement is that that development agreement calls for this development. It was approved the same night as the preliminary P. U. D. The interchangeable language between the ordinance and the development agreement. The references to the documents is being enforceable in relation to the development. They make that development agreement applicable to this project and not another project. Oh, so thank you for answering that. If we determine that the trial court aired in dismissing the citizens with prejudice, what is the effect of this? Does that mean that they just get to be a part of any portion of the case that goes forward or they get to file a new amended complaint for raising any Well, at this point there, there would certainly be an amended complaint filed because circumstances have changed. I think you noticed some of the change with the other parking deck. Um, there are other factors that are not in the record, um, that I'd be happy to address. I'm not sure what the appellees referred to as a possible mootness issue that was developing, but there was a matter before the village of Glen Ellen on this project, and that was something that we would have to address in an amended complaint as well. Citizens is the only party that brought count one and count two. So they would prosecute that claim in particular. Um, with respect to the accessibility code issues, I think they have a greater interest, a broader interest in ensuring accessible parking than shell properties does. If you can imagine historic preservation and retirees in town, they're going from restaurant to restaurant or stopping in for historic tourism. They tend to be a little bit older, and they have that accessibility need. Um, I think their interest is broader than the one individual that's on the board of the prime tenant at shop properties. Mr. Mr Daniel, what about the argument that the accessibility issue is not right yet? Um, obviously, going forward, uh, things can be amended to address the accessibility code. Why not wait for that opportunity and say that this issue is not yet right? I think in the accessibility context, there are elements. And as we presented this to the circuit court, there are elements of accessibility that may be adjusted. There are some that we told the circuit court that could not be adjusted because the project was essentially bursting at its seams. And it has, um, the project, we said, could not fit within its lot lines. And as it turns out, the project could not. Now, if you imagine adding an accessible parking space, that's nine ft to 16 ft, depending on how it's designed. If you four ft, that's not going to happen in the project that is already built at the lot lines and cannot expand further because it's contemplated to cross on to other properties that are abutting it. So it was ripe in our view, and that's that's what we argued in the circuit court. Thank you, Justice Brennan. Any additional questions? No, thank you, Justice Shostak. Any follow up questions? No, I think I've asked him. Thank you. Okay, Council, you will have an opportunity for a reply. Great. Thank you very much. Um, Mr Passman, I note that we we seem to have lost the video on Mr Day. So you may proceed first. Mr Day. I see him on my screen. Yeah, we've got him. Okay. I just see a telephone receiver. Mr Day, are you with us? Can you hear me? I Yes, I can hear you. Um, I cannot see you, but I can hear you. If the others can and you're ready to proceed, please do so. And you are going to undertake 10 minutes on behalf of the village of Glen Ellen. Correct? Correct. Okay, my my 10 minutes will be devoted to everything other than counts three through six. Mr Passman will address those particular counts. In this case, three diverse plaintiffs joined forces to retain a single attorney who filed a multifaceted complaint to prevent construction of a $40 million mixed use retail apartment and public parking garage TIF redevelopment project in downtown Glen Ellen. During the course of the unsuccessfully attempted to impose historic landmark designation on one of the parcels included within the redevelopment and unsuccessfully sought an emergency temporary restraining order in a commerical scattergun attack on every aspect of this project. After in a year and a half of plaintiffs litigating inordinately complex and serially deficient claims, judgments were entered in favor of defendants on each accounts within the 10 count second amended complaint. All know the facts of the case. We've read the facts of the case. Will you be able to address the LaSalle factors and why the court didn't get into those? I can't. Within the context of, uh, the LaSalle factors, the constitutional regulation associated with substantive due process was first addressed by the United States Supreme Court nearly 100 years ago in the Euclid decision. That decision has given rise to the name Euclidean zoning, which we now apply to virtually any zoning ordinance that regulates their zoning districts with different permitted and restricted uses in each category. In Euclid, the plaintiffs challenged the comprehensive village wise zoning, which divided the village into different land use districts and defined both permitted and prohibited land use for each individual zoning district. Euclid plaintiff asserted that he had been deprived of his property without the village providing due process. In Euclid, the trial court had held that the comprehensive zoning scheme was unconstitutional, void and enjoined enforcement. The United States Supreme Court reversed in 1926, and the Euclid decision introduced the controlling test to be applied in a substantive due process challenge to municipal zoning. In that case, the court stated, quote, It must be said before the ordinance can be declared unconstitutional, but such provisions are clearly arbitrary and unreasonable, having no substantial relationship to the public health, safety, morals or general welfare. The Euclid decision imposed what has become known as the rational basis test for judicial review of municipal land use regulations. Within the context of this long recognized rational basis test, the trial court in our case granted summary judgment on count seven and eight in favor of the village. The uncontested facts before the trial court included the 20 year history of legislative decisions adopted by a publicly vetted, collaboratively established set of community policies called for a large scale, mixed use, transportation oriented development and a public private partnership that would fundamentally alter the look, feel and economic profile of downtown Glen Ellyn. The planning process was deliberate, public, consistent and anything but arbitrary or capricious. The approved project challenged by the plaintiffs as serving no public interest, introduced a $40 million residential retail and 139 space indoor parking garage that would comply with the village TIF redevelopment plan, eliminate vacancies, create new residents with buying power, stimulate the growth of downtown businesses, comply with the streetscape planning, comply with the architectural guidelines and generate millions of dollars to help fund the new parking deck at Village Hall a half a block off of Main Street, not on the other side of town. The trial court found that each of these projects impact had a substantial relationship to and benefited the public welfare. Plaintiff disagreed. Plaintiff wanted the trial court to conduct a bench trial. Plaintiff wanted a hearing with expert testimony and judicial resolution of whether the building was too tall or whether it was too big. Plaintiffs wanted a judicial resolution of whether the parking spaces and travel aisles were the correct dimension. Plaintiffs wanted a judicial resolution as to whether the height had been measured by the correct methodology and plaintiffs wanted a judicial verdict to resolve whether the architecture in the apartment land use was in keeping with the quote feel and scale that was appropriate in downtown Glen Ellyn. In simple terms, what plaintiff wanted was for the trial court to pass judgment on whether the villages legislative decision to approve this redevelopment project was wise or advisable. And plaintiffs insisted then and continuing to insist now the judicial review of the wisdom of the village's legislative decision, which under the law is entitled to judicial deference, is somehow required by LaSalle Sinclair factors and related precedent in plaintiff's interpretation of the Illinois. You're not saying that the Euclid case does away with his Sinclair factors, are you? No, what I'm saying is the LaSalle factors didn't include the Sinclair factors. The Sinclair factors didn't include all of the LaSalle factors, and they are simply an inventory of what the Supreme Court has said might be relevant in an investigation. What is relevant is anything that could be illuminative of what the village is trying to accomplish on the project and whether or not what they're trying to accomplish on the project serves the public good. And I think this ties all the way back to the express language that came out of the Euclid decision nearly 100 years ago. If you look at the Euclid decision, there's a very interesting quote, and this is from 100 years ago. So the Sutherland said in the Euclid decision in 1926 is as follows. Regulations, the wisdom, necessity and validity of which has applied to existing conditions are so apparent that they are now uniformly sustained a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which before the advent of automobiles and rapid transit street railways would have been condemned as fatally arbitrary and unreasonable. And in this, there is no inconsistency. Constitutional guarantees never vary. The scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. That's from 100 years ago. And what we're saying in this case, is that since 1957, with the LaSalle factors, and since 1960, with the Sinclair factors, the universe has changed. We now have a TIF statute. We look to whether or not a community is blighted and needs to be altered. We look to whether or not you can utilize the funds for appropriate public purposes to try to stimulate redevelopment and improve the community. We also look to transportation oriented development, which frankly, 50 years ago didn't exist. And the concept of introducing multifamily residential in high density in downtown areas walking distance from public transportation is a new concept that is practiced throughout the metropolitan Chicagoland area, and creating adequate funding to support your business community and adequate funding to beautify the downtown and provide the streets to get improvements in public infrastructure. Those are all public purposes. None of those are even listed or described in either the LaSalle or the Sinclair factor cases. And as such, all we're saying is this. LaSalle and Sinclair discussed things in previous cases that had been taken into consideration. They did not create a laundry list of elements that have to be proven and addressed in every court proceeding. The question before the court is simply the rational basis test. Was it arbitrarily and capriciously made, or does it serve legitimate public health, welfare and safety purposes? That's the only question before the court. And our position is anything that is relevant to that inquiry that is admissible in evidence is relevant for the court to determine whether or not the decision Glenn Ellen made was serving the public good. It's not a question of whether or not the court can microanalyze the building to decide if it's too tall. That is not for the judiciary to decide. It's for the judiciary to make sure that when legislative branches undertaking decisions, they're serving the public purpose of their legislative calling. Mr Day, your time is running short. Justice Shostak, you had questions. I have one question. Can you speak to the landmark case? Or is that something you want Mr Passman to speak to the landmark case? I think related to the standing certainly of citizens. The standing issues are sort of interesting issues because frankly, count seven we think was an overwhelmingly compelled order in this particular case, and that dismissed count eight because that was an injunction. The rest of the counts, they didn't state a cause of action. So frankly, nobody has standing to assert a complaint that doesn't state a cause of action. And as it relates to counts one and two, citizens was attempting to assert that the Historic Preservation Commission had jurisdiction of this case, and none of the hearings associated with historic Preservation Commission were undertaken. Do you feel that counts one and two? Do you feel that counts one and two are moot as a result of the demolition of the shoe building? I think that they were moved as a result of the fact that the state of Illinois had signed off on the memorandum of understanding to demolish the structure, and the property owner refused to consent to  counts. One and two were rendered ineffective because they didn't state a cause of action. So whether citizens had standing to assert count one and two or didn't, the complaint that they asserted was not a valid complaint. It didn't state a cause of action. Why do counts three and four not state a cause of action? Uh, I'm gonna let Mr Passman answer those. I will respond if you would prefer. And then, as it relates to count nine and 10, count nine adopted a range of performance that was allowed for the developer to meet. He happened to meet it with what was ultimately the final PUD plan. But if the final PUD plan were declared to be invalid, then he would still have a range of performance under the redevelopment agreement, and the exact same situation applies to the purchase and sale agreement. So in that regard, I have nothing further. I'll answer any additional questions, but I'd like to hand it over to Mr Passman so he can address counts 3456. Justice shall stick any additional questions. No, no further questions for Mr Day. Just Brennan. No, thank you, Mr Passman. You will have five minutes. Move to mute, sir. Yes. Thank you. Thank you, Your Honors. May it please the court. I am Park Passman. I represent the two development entities in this case. We can go with all the arguments presented by Mr Day. And as he said, I'm gonna dress solely counts three through six. Uh, I'll take Justice Brennan. Uh, your question about country for there's one theme. There's three reasons why there's no cause of action. So are you getting an echo? Yes. I'm sorry. You have your phone, your cell phone on. Also, we can't hear you, Justice Sasson. Do you also have your cell phone on? No, I'm not hearing you. I can tell you speaking. I'm not hearing you. Yeah. The question was, you have your cell phone on. Also, I do not know. I don't hear an echo now. Okay, thank you. I'm in the same room as Mr Day. That may be why you heard both. So, okay, I'll continue. I apologize for that confusion. Counts three through six all address the parking facilities and all are brought under Sections 11 13 15 of the Illinois Municipal Code. That very structure is the first reason why Justice Brennan, all four of those counts don't state a cause of action. Plaintiffs assert that there will be violations of the Glen Ellyn zoning code, and there will be violations of the Illinois Accessibility Code if the parking facilities are constructed as designed. But that's speculative. There is no violation at this moment because there is no parking facility. 11 13 15 does not allow speculative lawsuits. It concerns actual real violations of local zoning regulations. So if there is no parking facility, there can be no violation by that facility of the zoning code or of the Accessibility Code to the extent that it's adopted. Uh, players plans have any impact here. Council plans that have been, uh, Crawford have any impact here. Uh, they don't for a couple of reasons. First is that we have an obligation to construct in accordance with Accessibility Code. That's a requirement of state law. It's incorporating the zoning code. If we do not, then we have a problem. I hope my clients don't do that. I don't expect that they will, but that's true of any number of provisions of the zoning code. There are all sorts of items that may or may not be covering the plans. Either we don't build in accordance with plans, or we do something in addition that this happens in building and zoning. And in the event that a property owner constructs or uses land in violation of local zoning, then at that time, it's appropriate to bring 11 13 15 action. So the fact that they're the fact that there were any accessibility code requirements weren't listed. In the preliminary P. U. D. Doesn't matter. Not for purposes of 11 13 15. Your honor, it's not uncommon. The zoning process, the requirements of plans and zoning process are different than those in the building permit process. You don't need the same level of detail. It's not reviewed the same way we went through a zoning process, a painstaking zoning process with all hearings as required by Glen Ellen Law. And after that happens, this is typical, and I think the court knows this. There's more detail that happens in building, and sometimes even through the building process, a developer doesn't do what they're supposed to, or something is missed. And in those cases, we agree there may be an action under 11 13 15. That's not the facts here. So you're saying it's premature. It is absolutely premature. Your honor, I don't believe there will ever be a case where we're gonna violate the zoning Glen Ellen, but there's certainly no violation today, and there wasn't a violation at any time when this was pending before the circuit court. Oh, even if the court disagrees with that, and they said maybe there is a room to have 11 13 15. Now there are still several reasons why counts three through six fail as a three and four. There is no private right of action under the Illinois Accessibility Code. This court recognizes much in dicta in Putnam versus the village of Bensonville. Plaintiff cites no case because there isn't one in which any Illinois court has found a private right of action on the Accessibility Code. Even if there might be one of the Accessibility Code, these plaintiffs certainly don't have that private right of action under the court. It looks like you're speaking. You're on mute, your honor. Do we need to address whether or not the code itself provides for a private cause of action? I don't think you need to, because I think you can dismiss three through six solely on the 11 13 15 argument I've just made. But you could also address it and find, as we believe that there is no private right of action, as Judge Wheaton found in the circuit court. There's a few reasons for that. I think most notably in this case, as the Corrigan versus Mewing Supreme Court decision holds among the criteria that a plaintiff must show to establish a private right of action is that the plaintiff is a member of the class for whose benefit the statute was enacted. Now the plaintiffs here, as Mr. Daniel concedes, are not disabled. They don't allege that. They allege that they might have visitors who are disabled, and the visitors might drive to their properties, and they might want to park in my client's parking facility. But that's not who the statute is intended to benefit. As it is, there's no guarantee that any property near the plaintiff's properties is a parking lot at all. So this notion that they have some rights to enforce disabled parking for other people, that is not enough to establish a private right of action under the Illinois Accessibility Code, if such a private right ever exists. We don't think it is a reason for that. One of the other criteria in the Corrigan case is that it's necessary to provide this remedy to plaintiffs. But the Accessibility Code can be enforced by the Attorney General. That's set forth in the Environmental Barriers Act, which is the statute through which the Accessibility Code is adopted. And further, in the event that there was a person who was entitled to use disabled parking, and they couldn't find a proper space in our client's parking lot, and they parked somewhere that was not accessible, and they were then injured, they would have a personal injury action there. There's no necessity for them to have a private right under the Accessibility Code. And so, for all of those reasons, count three and four, it's a failed state of claim. With my remaining time, I'd like to... I'm sorry, but your time has expired. Justice Shostak, do you have any additional questions? No. Justice Brennan? You're mute, sir. No, thank you. Okay. All right. Mr. Daniel, I'd like to offer a reply. Mr. Daniel, you are still mute. Perhaps start over. Thank you, Justice Jorgensen. I apologize for that. I'll pick up where Mr. Passman left off on three, four, five, and six, if I may. That's the initial brief part of the reply. The court does not necessarily have to address whether or not there's a private right of action under the Illinois Accessibility Code or the Environmental Barriers Act. It is an issue in the pleadings because that was raised by the defendants and something the court stuck with throughout, even though Glenallen authorizes that private right of action and its zoning code, as Justice Shostak noted, and the 11-13-15 relief is available under the adjoining Landowner Act in the Municipal Code. With respect to Mr. Passman's characterization of the public policy behind the Environmental Barriers Act, he's simply dead wrong. It's not just to protect people with disabilities or aid them or improve their living condition. It's to improve my condition. I'm able-bodied. I have a parent that is not. That statute is intended to improve the condition for all Illinoisans, not just those that have disabilities. That's where Mr. Passman is so incorrect, and that's where this issue of standing shouldn't get sidetracked to the issue of whether or not anyone's disabled. Mr. Daniel, if I may, what about this idea that if there is a private right of action, it's not ripe yet because we haven't reached the building permitting process where these things might more specifically be detailed? Well, the plans were solidified in the preliminary PUD drawings, and they were solidified to the extent where they had to construct in substantial conformity with those plans, including but not limited to a stated number of parking spaces. And Justice Brennan, this is in addition to the project exploding at it seems discussion that we had earlier on this topic. The number of parking spaces is set forth in the ordinance, and if an additional parking space is needed in those parking fields, you are losing a parking space because of the accessible aisle planning is the is is this notion that the project is exploding at the seams? Is that part of the record? That notion that argument is part of the record. We presented the zero lot line development. We presented how the parking lots could not be expanded horizontally or vertically within the project during argument. But it's not something that so just so I'm clear, this isn't something you're arguing that's that's happened since it's something that you're saying the planned unit development created. Justice Brennan, there's there's a point that Mr Passman made. I don't know that there will ever be a violation of the zoning ordinance by the developer, and I've been biting my tongue not to address issues that have developed subsequent to this appeal on that issue. We won't. I mean, I could answer your question, but it would bring in information from to do that. Please continue. Thank you. All right. No, thank you. Um, I'd like to conclude on this issue of the LaSalle Sinclair factors. Um, and that is something that is critical to all of us. LaSalle Sinclair provided an itemization of relevant information. How does how does the Euclid case change the Sinclair factors or does it not? I don't think the Euclid case changes him at all. It's the LaSalle Sinclair factors developed under this Euclidean zoning that Mr Day discussed. It's a way that Illinois is determined. These matters should be determined. And here are the factors. They're weighed. Not all of them may be present in every case. In addition, they're not exclusive. So the context in the spin that the village puts on this when Mr Day argued, he said that it's important to bring in anything illuminative of what the village is trying to accomplish. Well, that's great. That is one third of the analysis that LaSalle Sinclair is intended to set up. It's not what what's illuminative of the village's intent here. That's only part of the analysis. The impact on neighbors, the burdens on the property owner, the benefits to the property owner, the impact according to the comprehensive plan and the village's historical planning, the reliance and expectancy issues, the property value. Mr Day only addresses illumination of the village's interest because that's all they've got. That's all the court ruled on. And the TIF information may be relevant. It may be bring it in with proper evidence first. That is something the court made a as well. Bring it in with proper evidence so it can be tested and it's not hearsay or coming from a public record that hasn't been properly certified and is not admissible in court anyway. But the issue here is if you have a TIF district and a project approved within a TIF district, that's not your silver bullet to get through the LaSalle Sinclair pipeline test. And that's how I'd like to conclude. I'd be happy to answer any further questions. Um, it's always a privilege to appear before you. You don't deny that the ordinances are presumably valid. No, we aren't challenging that. We aren't challenging the burdens that we face. Uh, if we have the fortune to return to the trial court in this case, that is not the issue here. We're not trying to change anything under the law as it stands. Justice Chastik. Any additional questions? No, I have no further questions. Thank you. I do not. Thank you, gentlemen. Thank you for extraordinary arguments this morning. We will be adjourned for the day and you will receive a written disposition regarding this case in due course again. Thank you. Thank you very much.